UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRAVIS HERMIZ,

                    Plaintiff,                                    Case Number 16-11214
                                                                 Honorable David M. Lawson

v.

DAVID BUDZYNOWSKI, JAMES
WERN, KYLE KNAUSS, and
KRISTEN ROBINSON,

                    Defendants,
_____/

## OPINION AND ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

        Saint Patrick's Day 2016 did not bestow the Luck o' the Irish on plaintiff Travis Hermiz.

While interceding on behalf of a woman in an argument with her male companion at Royal Oak,

Michigan's Blackfinn's Pub, Hermiz threw a punch and was escorted from the bar by the

establishment, into the hands of Royal Oak city police officers.  In the course of effectuating the

arrest, the police horse-collar tackled Hermiz, threw him to the ground, and Tased him eight times,

at one point with officers deploying two separate Tasers against him simultaneously while he was

on the ground.  A police car dash camera and bystander videos captured segments of the event.

Hermiz alleges that the force was applied during the arrest when he was cooperating and not offering

any resistance, and therefore it was excessive and violated his rights under the Fourth Amendment.

The police officers say that Hermiz was actively resisting, their actions were justified, and they are

entitled to qualified immunity.  The defendants all have moved for summary judgment.  The

conflicting testimony and other evidence, which is not resolved by video evidence from three

separate sources, requires resolution by a jury. The motion for summary judgment will be denied.

## I.

The defendant police officers — Sergeant David Budzynowski, Officer Kyle Knauss, Officer James Wern, and Officer Kristen Robinson — responded to a complaint of "multiple fights" at Blackfinn's Pub in downtown Royal Oak on the evening of March 17, 2016. They entered the bar, which was packed with 200 to 300 patrons, some of whom were engaged in a general melee. According to the defendants, several of those present identified Hermiz as the person who had started the fight. Bouncers employed by the bar restrained the plaintiff and immediately handed him over to the police. The officers then took Hermiz outside to the sidewalk, where a crowd of people from the bar and passers by had gathered. Those facts are mostly undisputed, although Hermiz contends that police mistook him for another person — "Steewart" — who actually started the fight.

Once out on the sidewalk, the defendants assert that Hermiz resisted their efforts to handcuff him for about 25 seconds. That part of the encounter, they say, is not plainly depicted by the video record from the the police cruiser dash camera, because the view of the parties was blocked partially by the sidewalk crowd. After those first 25 seconds, the rest of the struggle on the sidewalk was captured by two bystanders who recorded the event using their cell phones. Those videos also are part of the record. The plaintiff focuses his claims on the force used by officers during the several minutes that were recorded in those videos. He maintains that he was cooperative throughout and did not resist.

As noted, the parties' accounts of the struggle differ. Starting with the testimony, the competing versions are outlined below.

## A. Plaintiff

Hermiz testified that he went out with friends for Saint Patrick's Day and, around 5:00 p.m., wound up at Blackfinn's Pub, where he was drinking. While he was in the pub, Hermiz saw another patron of the bar, Steewart Shaffou, arguing with a female friend of his and "dragging her by her hair." When he saw Shaffou punch the woman, Hermiz went over to him and asked "What are you doing?" Shaffou responded by "head butting" Hermiz. Hermiz then pushed Shaffou. Bouncers quickly grabbed Hermiz, halting the fight. The bouncers began to escort Hermiz toward the door, and when they were near the exit, "handed him off" to police officers who were there.

As they approached the door, one officer said to Hermiz "Put your hands behind your back," and Hermiz complied. The officers and Hermiz then exited the bar. Hermiz stated that as the officers "walked me out the door, I got a Taser in my back." Once outside, Hermiz was "jammed up against the brick wall," and one officer "grabbed [him by his] neck." Hermiz "turned" and said to the officers: "What are you doing? Calm down. I'm not doing nothing," and "Stop, I'm not resisting. What are you doing?" Hermiz stated that if he "didn't turn and avoid that brick wall, [his] face would have smashed [into it]." He also put his hands up, with his palms against the wall, to slow himself from hitting the wall. Hermiz then was elbowed, shoved, pushed, and pulled in different directions by several officers at once, had his legs pulled out from under him, and was shocked with a Taser several times. Hermiz stated that all he "was feeling at that point was pain," and that he was "was getting pulled and hit and dragged in every different direction." Hermiz testified that he "was not moving [under his own power]," but "was under their power," and was being "dragged" in whatever direction the officers were moving him. Hermiz stated that throughout the episode he "got pulled and dragged and [he] fell, because [he] just went wherever they took

[him], and wherever [he] landed," was where he wound up, which eventually was on top of Sergeant Budzynowski on the sidewalk.

## B. Defendants

### 1. Sergeant Budzynowski

Budzynowski admits that he activated his Taser four times during the encounter, for a total of 33 seconds, in "drive stun mode" (where the weapon is held directly against the suspect's body or clothing). The first time Budzynowski used his Taser was when he was standing behind Hermiz, shown at the start of the video. The other usages were when the two were on the ground. Budzynowski contends that during all of the activations, Hermiz was struggling and resisting the attempts by officers to restrain and handcuff him. Budzynowski also asserts that his expert's analysis demonstrates, based on electrical signal details from the Taser's activation logs, that the device had a weak connection and was transmitting a minimal or reduced charge for some of the time when it was used. Budzynowski testified that he first used the Taser when he saw Hermiz "push off the wall," and "not put his hands behind his back," and "start proceeding to kind of walk with Officer Knauss [] down the sidewalk." He shocked Hermiz with the Taser the first time because he heard Knauss tell Hermiz to put his hands behind his back and he "watched Mr. Hermiz push himself off the wall and resist Officer Knauss's attempts at doing that." Budzynowski conceded that he did not see Hermiz try to "swing at," "head butt," "kick," or "otherwise injure" any of the officers.

Budzynowski testified that when he Tased Hermiz, he was "trying to distract him" so that "officers could get his hands behind his back and get him handcuffed." Budzynowski stated that Hermiz resisted the officers' attempts to handcuff him by "tightening his muscles" so his arms could

not be put behind his back," and, before he used the Taser, Budzynowski said to Hermiz, "Stop resisting."

Budzynowski admitted that the attempt by the four officers to get Hermiz on the ground was "really sloppy" and "wasn't done very well in terms of the four officers working together as a team or unit," but he believed that the force used was not excessive. Budzynowski stated that even after the officers had Hermiz on the ground, he was "still pushing, trying to push himself up, move, twist and get out," and, even after he was handcuffed, Hermiz continued to "resist and wriggle," and "tried to sit up."

## 2. Officer Knauss

Officer Knauss admits that he activated his Taser four times during the encounter; the first of those times was during a 16-second period when Budzynowski also was using his device. Knauss fired his Taser in "probe mode" (where the device fires darts trailed by wires into the suspects clothing and applies the charge through those wires to the probe darts). Officer Knauss used his Taser for a total of 20 seconds during the struggle. He testified that he used his Taser on Hermiz after the officers and the plaintiff exited the bar for several reasons:

Q. And what was your basis for triggering the Taser gun on that occasion?
A. The first time?
Q. Yes, sir.
A. For many reasons.
Q. Please list them all.
A. Okay. It's St. Patrick's Day. There's a lot of alcohol that's consumed on St. Patrick's Day. We were already called to Blackfinn several times regarding fights. As I entered the bar, I saw Mr. Hermiz fighting, actively fighting with people. He was escorted out. He was told to put his hands behind his back, he was under arrest. And he started struggling. His family members were around us, his friends. It drew groups of people who were yelling and cursing and swearing at us. It made — he wasn't putting his hands behind his back, like he was told to do, so I tased him.
Q. Is that everything?

A.     Yes.

Knauss testified that two officers using their Tasers at the same time on a person could be warranted if the devices were "not functioning" or "there's not a complete cycle" of the electrical charge. He did not state that he was aware of any malfunction at the time, however.

Knauss stated that he believed the Taser usage was justified because Hermiz was "not under control" and was "resisting." However, Knauss conceded that when they exited the bar, Hermiz did not "try to run away," and he "walked with [the officers] voluntarily" out of the bar. Knauss also stated that, when Hermiz was on the ground, he tried to "push[] himself off the ground," and, when he was rolled over, Hermiz "appeared [to be] trying to kick" the officers.

### 3. Officer Wern

Officer James Wern testified that he "got involved" in the struggle with Hermiz when he saw "three fellow officers attempting to physically do something with Hermiz" and their efforts were "not successful." Wern stated that when he "came in to interact, [Hermiz] was being told to put his hands behind his back," but he "wasn't putting his hands behind his back" and "wasn't complying [with] what [the officers] were saying." According to Wern, Hermiz "kept walking north up Main Street," and he was "walking away from officers from the get-go . . . . [e]ven before the taser [was used]." Wern testified that Hermiz resisted the officers by walking away, refusing to put his hands behind his back, and "tensing up." Wern conceded that he did not see Hermiz verbally or physically threaten any of the officers. However, Wern stated that the uses of the Taser and physical force were warranted because Hermiz "wasn't under control."

Wern tacitly acknowledged that the failure to "control" Hermiz was also due to his fellow officers' incompetence. He stated that when the officers tried to take Hermiz to the ground, they

"weren't working together as a unit." And he conceded that when he tried to pull Hermiz's leg out from under him, Wern did not realize that Budzynowski was in front of Hermiz and that both would go down on the ground together. Wern admitted that, under the circumstances, and "in hindsight," the leg sweep was a "bad thing to do." Wern testified that he was "trying to get [Hermiz] to the ground so we could get control of him."

### 4. Officer Robinson

Officer Kristen Robinson testified that she used force on Hermiz when she "attempted to get his hands behind his back," "attempted to take him down to the ground," "used a knee strike to the common peroneal," "attempted jaw control twice on him," "pulled his arms out from underneath him when he was on the ground," and "pulled his hands behind his back." Robinson admitted that she did not see Hermiz "kick" or "swing at" or "attempt to injure" any of the officers, but she believed that force was needed because Hermiz was "actively pulling away from us" and "pushing off the wall" when officers tried to handcuff him. Robinson conceded that two officers Tasing a subject at the same time would be "excessive," and, if she had seen that happen, she "probably would have said 'Just use one.'" But she did not see Hermiz being Tased by Budzynowski and Knauss at the same time, because she was dealing with the crowd around the officers.

### C. Videos

The video evidence does not unequivocally confirm the officers' accounts. Hermiz believes that the cell phone video that was submitted as Exhibit 6 "show[s] the complete interaction between [him] and the police." Exhibits 4 and 5 to the defendants' motion depict brief periods — less than 10 seconds each — of the scene inside the bar. The defendants assert that Exhibit 4 shows Hermiz (near the bottom center of the frame, in a green shirt) being involved in a fight. Exhibit 5 shows

Hermiz being hustled to the door and out of the bar by officers. At least three officers have their hands or arms around Hermiz. However, it is difficult to tell how much of the rushed movement observed is from the officers' efforts to move Hermiz along and how much could be due to any resistance to those impulses by the plaintiff.

The dash camera video from Officer Robinson's police cruiser shows the officers emerge with Hermiz in tow at Timestamp 04:00. Due to the surrounding crowd, the parties' movements are difficult fully to discern, but Hermiz appears to be pulled or pushed by officers — although he also could be perceived to be pulling or pushing against them. Immediately after the parties exit, one of the officers can be heard saying "Turn around and put your hands behind your back." The officers then maneuver Hermiz so he is standing against and facing the brick wall of the building. One of the officers is heard to yell "Turn around! Turn around!" (presumably at Hermiz). Hermiz then briefly is seen moving down the sidewalk, away from the camera, along with at least one officer. From that point (TS 04:30), the dash camera's view of the struggle is entirely blocked, although it continued to record the same audio captured by the other videos. The next time the dash camera has a clear view of the parties (TS 07:20), Hermiz emerges from the crowd, in handcuffs, with one officer on each arm, and is walked by them past the front of Robinson's cruiser. The entire episode, from the time the parties leave the bar until Hermiz is taken away, lasts less than 3.5 minutes.

The "main event" begins in Exhibit 6 to the defendants' motion, which is a segment of video presumably recorded by a sidewalk bystander with a cell phone. When this video begins, Hermiz is standing, facing the camera, with his arms held behind his back. Officer Robinson has her arm looped through Hermiz's right arm and is standing on his right. Officer Knauss (the officer with close-cropped dark hair) is standing behind Hermiz, with his right hand on Hermiz's right shoulder,

and his other hand apparently on Hermiz's arms or hands. Sergeant Budzynowski (bald head), is standing to Hermiz's left. Officer Wern (grey hair and glasses) is behind Budzynowski.

At this point in the video, Hermiz has an inscrutable expression and manner; he appears to be staring into the air at nothing, and it is difficult to determine how much of the movement of himself and the officers is due to him "struggling" as opposed to the exertions of the officers around him. The defendants contend that this initial section of the video shows Hermiz "trying to walk away" from the officers, and "pulling his arm away" from their grasp. The video does not render that conclusion obvious. At around two seconds into the video, Hermiz's left arm is seen loosely waving by his side; it is difficult to tell if it was loose because he "pulled it away," or if whatever officer had hold of it briefly released his grip. Almost immediately after, Officer Wern, mostly out of frame to the right of the camera, wraps both of his forearms around Hermiz's neck in a so-called "horse collar" maneuver, and yanks Hermiz toward himself, probably in an attempt to get Hermiz to the ground. Hermiz turns or spins toward Wern and begins to lean or fall forward toward the sidewalk, At that point (TS 00:05), Budzynowski can be seen with his Taser pressed into Hermiz's back, between his shoulder blades. Budzynowski and Robinson then circle or stumble around Hermiz, rotating him with them, as all three veer toward the brick wall of the building behind them. As they turn (TS 00:06-07), Hermiz briefly is seen with both arms and hands held out before him, palms upwards. Budzynowski then attempts a "horse collar" maneuver of his own, continuing to spin around with his arms locked around Hermiz's neck. (TS 00:07.) At this point, the camera's view of Hermiz is blocked by the officers, but almost immediately after the officers and Hermiz stop veering to the right, Officer Wern again enters the melee, grabs one of Hermiz's legs, and yanks it

upward, pulling his legs out from under him (TS 00:08-09), and Hermiz nosedives toward the sidewalk.

At this point, another officer turns to face the camera and stands between the four officers and Hermiz, yelling at the crowd to "back up." Around 15 seconds in, the camera has a clear view of Hermiz prone, facing the sidewalk, with officer Robinson and another (unidentified) officer having hold of his arms and head. Hermiz has his arms outstretched, apparently attempting to prevent himself from being shoved or falling face-first into the sidewalk. Officer Wern then yanks Hermiz back toward himself (to the left of the frame), and Hermiz collapses into the lap of Sergeant Budzynowski, who by now is sitting on the sidewalk. (TS 00:15.) Immediately after, Hermiz is seen with his right hand open, palm on the sidewalk, face down laying across Budzynowski's lap, as Knauss is seen drawing his Taser and yelling, "Tase him! Tase him! Tase him!" Knauss then fires the Taser at Hermiz's back, and the electrical sound of the weapon firing can be heard. Meanwhile, Officer Robinson appears to have hold of Hermiz's shoulder or head and seems to be struggling.

The camera briefly turns away from the officers and Hermiz, and when it returns Hermiz is face down on the pavement, with his arms behind him, and officers Knauss, Robinson, and Budzynowski on top of him, holding him down. Knauss has his knee on Hermiz's back and Robinson and Budzynowski seem to have hold of Hermiz's arms. Wern is standing over them. Hermiz can be heard crying out at this point, although it is not clear why. (TS 00:35.) As Hermiz lies on the sidewalk, face down, with the officers on top of him, and as his right arm is pulled by one of the officers around and behind his back, the electrical sound of another Taser discharge (apparently by Budzynowski) clearly can be heard. (TS 00:45.) By the one-minute mark, Officers

Knauss and Robinson have their knees on Hermiz's back, and he is face down on the sidewalk with both arms behind him, apparently in handcuffs. His leg and foot can be seen free behind him, loosely waving side to side. Officers Robinson and Knauss appear to relax and withdraw somewhat at this point, although another officer partly blocks the view. (TS 01:10.) Officer Robinson then stands up, and Budzynowski is partly seen yelling and pointing at bystanders, sitting or kneeling beside Hermiz, while Knauss remains with his knee on Hermiz's back. (TS 01:15.)

For the next approximately 20 seconds, the view of Hermiz is blocked by officers and bystanders standing or milling in front of the camera. When he is revealed again, Budzynowski and Knauss have Hermiz, still face down on the sidewalk, loosely in their grip. They then attempt to roll him over so that he is laying on his back. (TS 01:45.) However, Knauss pushes him hand firmly into Hermiz's back, forcing him back down onto the sidewalk, face down. (TS 01:50.) The officers then attempt again to roll Hermiz over, and this time succeed. As he is being rolled over, it appears that Hermiz could be wriggling, although it is hard to tell whether his movements are due to his own efforts or Budzynowski's attempts to roll him over, and whether Hermiz's movements are attributable to a possible attempt to get up, or get free, or due to the discomfort of an awkward position resulting in his arms or elbows being twisted or forced against the concrete. (TS 02:00-10.) When Hermiz is rolled onto his back, he lies supine on the sidewalk, with his handcuffed arms underneath him, and his head on the ground. At this point Knauss is kneeling with his knee pressed into Hermiz's chest, and Budzynowski has his knee pressed into Hermiz's abdomen. (TS 02:11). Hermiz is seen to raise his head and say something to Knauss, who looks down at him and screams, "Calm down! Calm down!" (TS: 02:20.) Hermiz raises his head and speaks again about five

seconds later, but by them Knauss and Budzynowski, still kneeling on him, appear to be distracted by the crowd around them.  (TS 02:25-30.)

Exhibit 7 to the defendants' motion is a cell phone video shot by another bystander, from a slightly different point of view, which appears to begin around the 15 to 20 second mark into the Exhibit 6 video.  The first visible interaction shows Budzynowski seated on the ground with Hermiz laying across his lap, and Knauss standing over both of them, yelling "Tase him!"  The sound of a Taser firing clearly is heard from approximately one second into this video, and Knauss and Budzynowski both can be seen with their Tasers in their hands.  It appears that both of them are using the devices at this point, and visible discharges can be seen from Budzynowski's device.  (TS 00:00-00:05.)  Budzynowski continues to trigger the Taser through at least 16 seconds into the video.  Throughout this time, Hermiz seems to be writhing on the ground and his legs are seen flailing around or from side to side; it is hard to tell if this is due to him struggling to get free, or if it is due to pain or an involuntary reaction to the Taser shocks.  (TS 00:06-16.)

At about 20 seconds into the video, the view of Hermiz is blocked, but his legs are laying flat and loose on the ground, and a Taser can again clearly be heard firing.  (TS 00:20-25.)  By 30 seconds, Hermiz appears to be completely limp, and Budzynowski is seen with his right knee pressed into the back of Hermiz's left leg.  (TS 00:30.)  Hermiz's feet move slightly near the end of the video, as he remains face down; however, the toes of his shoes are touching the sidewalk, except briefly when his right foot raises slightly and waves slowly in the air.  (TS 00:35-45.)  The video then ends after 45-seconds.

## D. Procedural History

The plaintiff filed his original complaint in this case within a month of the incident. That complaint named several of the defendants by pseudonyms, and it also included various claims against the Royal Oak Police Chief, based on conspiracy and supervisory liability. The complaint (in its second amended iteration) named the four individual officers. The parties later stipulated to dismiss all counts of the complaint except Count I, which alleges excessive use of force by those officers. All claims against Chief O'Donohue (and, by extension, the City of Royal Oak) have been dismissed. After discovery closed, the defendants filed their motion for summary judgment, and then an amended motion to correct their failure to comply with certain local rules on the first filing. The Court heard oral argument on May 18, 2017.

## II.

The defendants each argue that plaintiff Hermiz actively resisted arrest, and therefore they were justified in the amount of force they used to effectuate the arrest. They point to the following conduct: (1) refusing to "turn around" or present his hands to be handcuffed; (2) "walking away" from the officers; (3) "pulling his arm away" when they tried to cuff him; (4) "flexing" and struggling as they attempted to take him to the ground and hold him down; and (5) trying to "kick" the officers with his feet after he was pinned on the ground. The plaintiff, unsurprisingly, asserts that he did none of those things. Both sides rely on the video recording of the episode (principally the defendants' Exhibits 6 and 7) as back up for their accounts of the arrest. The officers contend that their actions were "reasonable" within the meaning of the Fourth Amendment; but even if the degree of force they used presents a close legal question in light of the undisputed facts, they are entitled to qualified immunity as a matter of law.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

The defendants insist that they are entitled to qualified immunity from the plaintiffs' claims. The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). But that affirmative defense protects government actors performing discretionary functions from liability for civil damages only when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). The plaintiff must clear both hurdles, but the Court may take up the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (abrogating in part *Saucier*, 533 U.S. at 201). "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

The qualified immunity defense may be raised at any stage of the case. When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 378, 380 (2007). That means that the court must view the facts in the light most favorable to the plaintiff. *Saucier*, 533 U.S. at 201. "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.

Hermiz raised several claims in his complaint, but the sole remaining claim is that the officers used excessive force in effectuating the arrest. The Court uses "the Fourth Amendment's unreasonable seizure jurisprudence" to assess such claims. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009); *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). The test is an objective one, requiring a "balancing [of] the consequences to the individual against the government's interests in effecting the seizure." *Ibid.* (citations omitted); *see also Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

evade arrest by flight." *Ibid.* (citing *Kostrzewa*, 247 F.3d at 639; *Graham*, 490 U.S. at 396). The focus is "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 607-08 (citing *Morrison*, 583 F.3d at 401; *Graham*, 490 U.S. at 396).

The defendants have asserted several arguments in support of their motion, but they acknowledged at oral argument that the pivotal question in this case is whether the record demonstrates without contest that Hermiz was actively resisting arrest when the officers took him to the ground and deployed their tasers. That, indeed, is the key question here. "'When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.'" *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). Those principles are clearly established.

The Sixth Circuit has "held that mere noncompliance is not active resistance." *Woodcock v. City of Bowling Green*, No. 16-5322, 2017 WL 633385, at *4 (6th Cir. Feb. 16, 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323-24 (6th Cir. 2015) (holding that refusal to comply with an officer's command to step outside the apartment was not active resistance); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more.")). The court of appeals has "long distinguished active resistance by arrestees from passive resistance." *Jackson v. Washtenaw County*, No. 15-1250, 2017 WL 416973, at *3 (6th Cir. Jan. 31, 2017) (citing *Goodwin*, 781 F.3d at 323). "The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." (citing *Goodwin*, 781 F.3d at 323; *Rudlaff*, 791 F.3d at 641). "The latter is generally shown by the lack of

physical resistance or verbal antagonism." (citing *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge*, 533 F. App'x at 535).

The parties tell two different stories. As noted above, the officers contend that Hermiz actively resisted arrest in several ways. Hermiz testified that he cooperated with the police from the time he encountered them at Blackfinn's Pub. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380 (quoting Fed. Rule Civ. P. 56(c)). The defendants filed as exhibits to their motion for summary judgment several video exhibits that captured most of the interaction between the officers and the plaintiff on the sidewalk. It is accepted law in this circuit that if such a recording discloses facts or observations at odds with either party's position or testimony, the Court must accept the circumstances plainly depicted by the video, and it must reject contrary testimony and other information presented by the parties. *Harris v. City of Circleville*, 583 F.3d 356, 364 (6th Cir. 2009) ("When no facts are in dispute, whether an official receives qualified immunity is a question of law."). However the video evidence is anything but plain and unequivocal. In many respects, it supports Hermiz's version of the events.

The jury readily could perceive the video record as being consistent with Hermiz's testimony that he offered no resistance to the officers' efforts to apprehend him — at least during the portion of the episode captured by the recordings — and that the officers therefore were not justified in deploying any physical force against him, whether by manual means or through use of their Tasers. It certainly was well known by March 17, 2016 that an unresisting suspect has a clearly established right not to be subjected to violent physical takedown maneuvers and repeated Taser shocks during the course of an arrest, where it is undisputed that the plaintiff posed no threat to the officers' safety,

and where he does nothing to oppose the efforts of officers to apprehend and restrain him. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 608 (6th Cir. 2006) ("'Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.'" (quoting *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) (collecting cases)). Here, the jury could find that Hermiz did not resist, and nothing depicted in the video obviously would negate such a finding.

Citing the cell phone video and the testimony of the four officers, the defendants assert that Hermiz's "active resistance" to their efforts to handcuff him comprised "walking away from the officers, pulling his arms away from the officers, stiffening his muscles, disobeying orders, arguing with the officers, fighting their attempts to bring him to the ground, resisting their attempts to handcuff him, kicking his legs, and refusing to lie on the ground." The jury could accept that account of what the video recording depicts as plausible; but it also reasonably could decide that the video depicts no such things, and that Hermiz's movements, so far as the impulses for them can be divined from the video, were entirely passive or due to the officers' exertions and not his own. The jury reasonably could accept the testimony of the officers that Hermiz did resist, they could find that the video depicts movements by him that are consistent with the officers' testimony, and they could conclude that Hermiz resisted in ways that are not apparent from the video at first glance. But they also reasonably could view the video as depicting no actual active resistance by the plaintiff to anything that the officers did, or told him to do. Which version of the episode to accept, in light of all the evidence offered by the parties, is quintessentially the province of the fact-finder, not the Court, to decide.

A.

Officers Budzynowski and Knauss activated their Tasers four times each, for a total of 53 seconds; at one point both were using them at the same time. Those activations all occurred during a 50-second window between 00:15 and 01:05 in the cell phone video (Exhibit 6). Budzynowski and Wern do not dispute that they used the "horse collar" and "leg sweep" maneuvers shown in the video. Between 00:10 and 00:20 of Exhibit 6, five officers appear to be in a contest of "tug of war" over Hermiz, with each of them having hold of a different limb or other portion of his person, while they proceed to yank him violently back and forth. By this point the video suggests that the officers are fighting each other rather than struggling to subdue Hermiz, and Hermiz's demeanor plausibly could be read by the jury to suggest that he is merely helplessly along for the ride, and that he made little or no physical effort to do anything more than keep himself from being rammed face-first into the sidewalk by the opposing efforts of the several officers. If the jury determines that Hermiz did not resist any of the officers' attempts to handcuff and subdue him (which would be a plausible finding from the evidence presented so far) it readily could determine that the repeated Taser deployments and takedown maneuvers were objectively unreasonable actions by officers carrying out an arrest of an unresisting suspect.

The Sixth Circuit has recognized that a "'deliberate act of defiance' using one's body can constitute active resistance, such as where a suspect resist[s] arrest by 'laying down on the pavement and deliberately locking his arms together tightly under his body while kicking and screaming.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534-35 (6th Cir. 2013)). But the plaintiff's conduct here reasonably could be found by a jury to involve, at most, only "passive resistance," or failure to comply with

competing and vigorously opposing efforts by the officers to tackle and handcuff him. Such "passive resistance" — if there was resistance at all, which the video strongly suggests there was not — cannot suffice to justify the defendants' application of repeated Taser shocks and violent "horse collar" and "leg sweep" takedown moves. *Jackson v. Washtenaw County*, No. 15-1250, 2017 WL 416973, at *4 (6th Cir. Jan. 31, 2017) ("We have held that a failure to present one's arms to an officer upon request without more is at most passive resistance, but that a physical struggle to maintain control of one's limbs while being placed in handcuffs can be active resistance.").

In their briefing, the defendants expound at length on circumstances and interactions that occurred before the critical two-minute period captured by video recordings in the record, and they offer those events as justification for the uses of force shown in the videos. But whether or not the defendant resisted before the cameras started rolling is immaterial to whether the uses of force depicted in the videos, *when they were applied*, were warranted by the plaintiff's continued resistance. Each action by the officers must be analyzed to determine whether it was appropriate when it was taken, not whether it could have been appropriate at an earlier moment, based on things that happened earlier, or, perhaps, in response to resistance that might have occurred, but had by then ceased. *See Jackson*, 2017 WL 416973, at *3 ("Because each tasing or punch can be a separate constitutional violation, we analyze them in turn.").

Here, a jury reasonably could conclude that defendant Sergeant David Budzynowski's use of force against the plaintiff was objectively unreasonable where it included activating his Taser four times, employing "takedown" maneuvers, and kneeling on the plaintiff's abdomen while he was lying on his back on the sidewalk, with handcuffs on, and that the use of force was not warranted by any active resistance. Likewise, a jury could find that Officer Kyle Knauss's use of force against

the plaintiff was objectively unreasonable where it included activating his Taser four times, grinding the plaintiff's face into the sidewalk, and kneeling on the plaintiff's chest while he was lying on his back on the sidewalk, with handcuffs on, and that the use of force was not warranted by any active resistance. And a jury reasonably could conclude that defendant Officer James Wern's use of force in the form of takedown maneuvers was objectively unreasonable and that the use of force was not warranted by any active resistance.

## B.

The plaintiff also contends that each of the defendants, notably Officer Kristen Robinson, violated his Fourth Amendment rights when they failed to intervene to prevent the application of excessive force over the course of the entire transaction. The Sixth Circuit has held "that a police officer who fails to act to prevent the use of excessive force may [] be held liable where '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). However, "officers cannot be held liable under this theory if they do not have 'a realistic opportunity to intervene and prevent harm.'" *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013).

On the record presented here, all four of the defendants could be held to account for their failure to intervene, where the video recording shows not only that all four of them witnessed the various applications of force by their fellow officers over the course of more than two minutes, but also that each of them participated in and facilitated that application of force by their own exertions. Officer Robinson did not take down the plaintiff or deploy a Taser, but she observed her fellow

officers engage in that conduct and she was close enough to the action to prevent the application of force to the unresisting plaintiff. "[A]n officer's mere participation in events that include the use of excessive force is not itself sufficient grounds to impose liability [on a failure to intervene theory]," but "when an officer has 'direct responsibility for [the] allegedly excessive force [then he or she] may be liable." *Landis v. Galarneau*, 483 F. App'x 209, 211 (6th Cir. 2012) (citing *Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007)).

## C.

Where the basic facts that bear on the immunity defense — such as whether the plaintiff "actively resisted" officers, or offered no resistance — are hotly disputed, and where the record evidence could support either side's story, judgment as a matter of law on qualified immunity is precluded. "Qualified immunity is an affirmative defense." *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (citing *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002)). "The defendant therefore 'bears the burden of pleading the defense, but the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct.'" *Ibid.* (quoting *Sheets*, 287 F.3d at 586). "In other words, '[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.'" *Ibid.*

Nevertheless, a defendant seeking judgment as a matter of law on his immunity defense must establish either that the facts, taken entirely as proffered by the plaintiff, are insufficient to make out a violation of his clearly established right, or that no genuine dispute of material fact remains for trial as to any of the operative facts pertinent to the alleged violation. "If the district court

determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment." *Thompson v. City of Lebanon, Tennessee*, 831 F.3d 366, 370 (6th Cir. 2016) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015)); *see also Nelson v. City of Madison Heights*, 845 F.3d 695, 699 (6th Cir. 2017) ("'A defendant challenging a denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" (quoting *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011)); *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) ("[I]f the qualified immunity questions presented are fact-intensive, the record may not be adequately developed to evaluate the defense at the pleading stage under Rule 12(b)(6)." (citing *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)). In this case, the opposing views of the material facts and circumstances of the alleged use of force preclude application of the qualified immunity defense before trial. Either party's construction of the events reasonably could be accepted by the jury.

## III.

The defendants' motion for summary judgment is mainly based on qualified immunity. As with most cases of this sort, however, they must "adopt[] . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378. Taken in the light most favorable to the plaintiff, those facts show that the conduct of each of the four defendants violated the plaintiff's clearly established rights under the Fourth Amendment.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #65]

is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: June 13, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 13, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI